Our next case for argument is United States v. Kabir. Good morning. May it please the Court, Jia Kim appearing on behalf of Appellant Sohiel Kabir. I'd like to reserve five minutes of my time for rebuttal. Just for the benefit of counsel, when we finish with this public argument, we'll retire to our roving room and have the government counsel address us on some of the other classified issues. Thank you, Your Honor. Unless the Court is inclined to begin elsewhere, this morning I plan to address first the sufficiency of the evidence on Count 5, which is the conspiracy to kill federal officers, and then discuss the District Court's denial of a mistrial after several jurors were frightened and distracted by a courtroom spectator. And then, time permitting, I would like to address some of the evidentiary issues, beginning with the issues having to do with classified evidence. First, the sufficiency of the evidence on Count 5. For a conviction under Sections 1117 and 1114, the government must prove beyond a reasonable doubt several elements. The first is the federal jurisdictional element, that is, that any agreement that was arrived at sufficiently threatened a federal officer so as to justify the exercise of federal jurisdiction. Second, and very closely related in this case, is that there was a specific agreement that contemplated the killing of a U.S. officer. Not just simply a general intent to, quote, fight, to use some of the parlance in this case, or even a general intent to kill, but that the contemplated objects of an agreement was a federal officer. But doesn't the record include numerous statements from the defendants specifically listing American soldiers, that they intended to fight and kill American soldiers? Why isn't that sufficient? I would say that the record does not include such statements. What the district court relied on were three things primarily. First, the cooperating defendant, Arafin Gojali, testified that he personally intended to go oversee and kill American soldiers. However, on cross-examination, and this is a part of the evidence in the case, and this is evidence that I believe cannot be viewed in a light favorable to the government, he was asked, there wasn't a firm plan, and he said, as to whom the targets would be, and he said, no, there was no firm plan. There could be specific individuals rather than American soldiers, because I'm looking at multiple ER sites that we could run through where American soldiers are specifically identified, in general, as the target, not, you know, John Smith or Jane Doe, but American soldiers. Well, I believe under FIOLA, FIOLA talks about a continuum between mere preparation and commission of an offense, and sometimes the offense itself has been committed, and it becomes quite clear in those cases what the conspiracy embraced. But FIOLA also says in the case of an unconsummated conspiracy, that you have to look at, more closely at the knowledge and the intent of what the agreement embraced. And the words it uses is well-formed and crystallized, and we would argue that any intent here was not well-formed and crystallized. The district court at ER 192 and 193, in its written order, cited two other statements, and those were De Leon, the co-defendant who also went to trial. He told Gojali, when Kabir was in Afghanistan and not there, they're talking about the rules of engagement. Is it possible to kill women in combat? And he says, what about a U.S. girl in the Army? Under FIOLA, which says sufficient specificity, whether by name or unique characteristic, I don't believe that that satisfies the FIOLA standard. The second thing the district court relied on was a very similar kind of context, discussing the morality of using alcohol as a battle technique, eating pork if it were necessary, despite the fact that Islam prohibits that, and also the morality of suicide bombing. They're talking about, say, someone told you this general was a very motivational speaker. This is at ER 192 and 193. The district court is discussing this. Would it be permissible to kill that person? There's no mention of who this general is. This general is not a specific person. And I think looking at the universe of Section 1117 cases, there is no case in which the evidence was this unformed and not crystallized. It doesn't necessarily have to be a person identified by name or position, such as the U.S. attorney in this Courtscroft case. But I think in every case, the Duca, that's the Fort Dix case, Hassan is the Quantico case, the agreement had become sufficiently crystallized for criminal liability as to this count. Now, we haven't challenged the sufficiency of the conspiracy to provide material support, and it is possible that criminal intent and agreement for different conspiracies crystallizes at a different stage. This is a far more specific conspiracy than that general material support. So when did the intent crystallize? I mean, Mr. Kabir had already gone to Afghanistan, was still communicating with the co-defendants, and the co-defendants were arrested while en route to an airport to go to Afghanistan. So why isn't that sufficient to find that their agreement had crystallized? I mean, perhaps it had crystallized for sufficient for probable cause to arrest, especially on some of these other conspiracies that were charged. The first charge here was the material support conspiracy, and we are not challenging that the evidence was insufficient on that count. However, we would argue that the agreement never crystallized as to killing an American soldier. What about counts two and four? Counts two and four, those are the al-Qaeda related counts. And again, it's a question of what the agreement embraced and whether, I think the question there is more, certainly there were preparatory discussions and debates about possible groups. And the significance of the al-Qaeda versus Taliban discussion here was that, you know, perhaps surprisingly or not, only al-Qaeda is designated as a foreign terrorist organization that gives rise to liability under 18 U.S.C. 2339, capital B. The Taliban is not. And I would say in the overall record of this case, there is far more evidence related to the Taliban than to al-Qaeda. And the government, I think, relies upon this pretty heavily, so I think it's certainly fair to have you respond and address that. About a conversation, I think it was around August of 2011, 2012, where Mr. Kabir and at least some of the co-defendants, I'm not sure all of them were on this call, talked about the students and the professors. And it wasn't, you know, an hour's long conversation, but it went on for several lines back and forth. And there was evidence that the students were the Taliban, the professors were al-Qaeda. And so in that discussion, Mr. Kabir was telling the group that the plan was to come and first join the Taliban and then sort of work their way up to join al-Qaeda. Why is that characterization of that conversation incorrect or unfair in some way? I agree that that is what the government primarily relies on for these al-Qaeda counts. And I believe that's insufficient because there's no evidence that Mr. Kabir knew what professors meant. So even though he was using the terminology himself, your argument is he didn't understand it. And he also used other code words like wedding and swap meet. Why was it not reasonable? Why couldn't a reasonable juror conclude that he understood this code language that he was using with his co-defendants? I think precisely because there's evidence that he was told what swap meet meant. They were talking code. He didn't understand that. He had to be told what that meant. But in this instance, there was testimony that what he described, essentially going before one of the professors and being accepted, was actually the procedure that was employed by al-Qaeda, that when he told the others you have to go before one of the professors, he was right. So with that other testimony, wasn't there enough for the jurors to reasonably conclude that he understood what professors meant and he knew it meant al-Qaeda? I don't think so. And for this reason is that he says at one point saying, speaking vaguely, but sort of the Taliban, and this I think is generally accurate, are in Afghanistan. The others are not. The others are in the mountains. The others are in the mountains, yes. And I think one could reasonably refer that refers to al-Qaeda. That does correspond to the expert testimony, I think, of both experts. And I don't think either expert said that you, in fact, do advance from the Taliban to al-Qaeda. They speak different languages. While at one point in the 1990s, the Taliban may have given safe cover to al-Qaeda, everything changed after September 11th. So does it matter? So suppose Mr. Kabir lacked sophisticated understanding of these entities, these organizations, but nonetheless said we want to join the students and then we'll join the professors. Does it matter if he didn't understand how the two organizations related to each other or if they didn't relate to each other at all? Not necessarily, Your Honor. But I do believe it goes to whether the sense in which he was using the word professors. I think this case is unusual given the wiretapping, the sweeping of the digital devices and the fact that Mr. Kabir was so far away that basically all of his communications with the U.S.-based defendants are in some form recorded. There's chats. There are, you know, as this one call where you can actually see him on the little cell phone. There is no indication that he was ever told professors. Students, Taliban means students. That is not a big leap. And that was a question from the confidential informant who said, what are students? And then somebody, one of the co-defendants explained it was the Taliban. And he said, oh, yes, yes. But Mr. Kabir didn't ask that. I mean, I don't remember Mr. Kabir asking that. Correct. I think it's fair to assume he would know what the students meant. And he didn't ask, what does professors mean? No, he did not. But he gave some sort of nonsensical answer. I would encourage the court to listen to some of these tapes, because I think there are nonsensical answers that are pauses. And I think there's not sufficient evidence that he knew what professors meant. He was told what umrah, which, you know, generally means pilgrimage, that that means jihad. He was told that swap meet means firing range. There's no evidence that he was told this. He was told firing range after he had already left the United States at that point. And so they were talking about the swap meet. But that seems different from his use in his discussions with him of the term professor. And as far as the nonsensical responses, and I may be misremembering, there were a lot of briefs in this case. I don't remember your brief arguing that with respect to the discussion about students and professors, but rather with the discussion about C-4 explosives. Yes, I think I agree it was more prominent in that context. But I think it comes down to within the evidence in this case and the understanding that much of this evidence, if not all of his communications were captured and recorded, that there is no time and there's no other time that he shows he knows what that meant. In context, I believe it's clear that professors means the leaders of the Taliban. There's no other time that he deploys that term or uses it. And it's a term that even the people in the U.S. had to be told what it's meant because it is not self-evident. What about the conversation where the co-defendants are discussing what form of Islam they'll practice? And Mr. Kabir's heard yelling, AQ, AQ, AQ. I mean, he mentions al-Qaeda as their, it seems he's talking about al-Qaeda as their ultimate goal. That conversation occurred. However, in a subsequent to this August conversation we're discussing, there is still, it appears that no firm agreement has been reached as of that count. And that while there is, let's call it lobbying on both sides of that question, I don't think the government has pointed to a place after Mr. Kabir says, let me know which one and let me know in other cases has been evidence that a firm conspiracy has not been reached. If there was an agreement to join one or the other or both, that's not sufficient in your view? They have to have settled on one entity and that's it? I believe so, Your Honor. The district court in this case used a lot of bank robbery analogies. I think if there's a general agreement we're going to rob something. It could be a liquor store. It could be an FDIC insured institution. Let me know one or the other. I think only one of those here would qualify for conviction under the relevant, would be a federal offense. Okay. Yes. If I may turn briefly to the juror question. The district court erred in not granting a mistrial here. First of all, the judge should have applied a presumption of prejudice on the facts of this case. Let's say we agree to that and not spend a lot of time arguing about whether the presumption applied. I think the case you rely on is Simtab? Yes. Okay. The court found there was a presumption of prejudice from, I believe it was a defendant rolling his eyes or eyeballing somebody. But what seemed to be dispositive there was that the district judge didn't bring the jurors in and question them about what had occurred. But that's exactly the opposite of what occurred here. The district judge brought every single juror in, first gave them explanation, brought every single one of them in and questioned them. So why would Simtab mean that there should have been a mistrial? Simtab is important for whether the presumption applies question. Here, it is precisely because of what came out during that colloquy that the mistrial should have been called. So two jurors, I think, said they were nervous or talked about some concerns. But at the end of each colloquy, they all said, I can set this aside. I can be fair and impartial. Why isn't that sufficient? I mean, this court and the Supreme Court have discounted those assertions of juror impartiality, even if the jurors, and there's no reason to think they – If the presumption applies, it's not rebuttable? No, it is rebuttable. However – Why couldn't the district court here, based upon the individual assessments, determine that they could proceed with the case in a fair manner? I think the crucial question is that those two jurors, first of all, were distracted. And I don't think there's any way to recover that, especially when they were distracted during the defendant's cross-examination. Second, the district court's first attempt to cure any prejudice – The defense did not ask for mistrial right away, when the note was written. They only asked for it when a third juror came forward, and there was a sidebar, and some of this evidence came out about being walked to the car. Then the colloquy with the other jurors happened. Okay, but one of the factors that I think is significant – I think Judge Pius's question raises an important point. Is this presumption rebuttable, and what does the district court have to do? So, it's undisputed. We've all read the transcript. It goes on for pages and pages, where the district judge brings each juror in individually and asks them questions. But also, what's significant about this case, I think, and distinguishes it from others you've cited, is that what happened here was innocuous and easily explained. So, the district judge explained to the jurors that this is a law student extern. He's here in the building to interview for a job. He was assisting the defense team. And all of the jurors affirmed that once they heard the explanation, they were at ease. They understood. It's different from cases where – I believe there's a case where there's something like 10 IRS agents sitting behind the government table, or there had been threatening phone calls to the jurors, and there was no innocuous explanation that the jurors could accept. I mean, isn't that something that weighs in favor of the district judge's conclusion that there was no mistrial? I would argue not when jurors 4 and 10 said that after receiving that explanation, which would seem to dispel lingering fears and doubts, they continued to be fearful or wonder. And juror 4 said she thought that, you know, okay, maybe I can accept he's working with the defense. I continue to think he may have an ulterior motive. The district court didn't go into that further. Juror 10 said twice, and the district court wasn't sure she had heard correctly the first time, that, yes, I continued to be anxious about it even after your explanation. And I think that is a critical factor. Also, regardless of the innocuous source of the, you know, episode, the juror's reaction to it is really what matters. And I think the degree of fear exhibited here surpasses what we see in the law of the cases, even when the circumstances in those cases may have been objectively more menacing. I don't think the government has cited a case where the jurors who stayed on the jury, they were not excused, talked to multiple other jurors, said they continued to be fearful, and the presumption could be rebutted, or they, you know, they didn't think it was a joke. Those are the cases in which the presumption is rebutted, not when a juror, upon questioning from the judge, and I think it especially is sensitive here, and Peña Rodriguez is helpful in explaining why, you know, the judge is in a difficult situation in exploring questions that may have to do with racial bias. The Supreme Court and this court have said it's like a Scylla and Charybdis. You may be creating the exact problem you're trying to avoid by, you know, otherwise you might not ask enough questions to really get at the problem. But that assertion, general questions about impartiality, which is what was done here, are not enough. So can you just tell me again, I'd like to go back and look at the transcript, which were the jurors that you're concerned about, number four and ten? Juror number four at pages 20, 49, and 50 said she thought, she continued to think he had an ulterior motive and was distracting. She was the one who had checked the backseat. Juror ten at 2060, ER 2060, said she continued to have concerns after the district court's thorough explanation of who this person was and his legitimate reasons for being in the courtroom. That was when she gave her oral explanation to the jury as a whole? Yes. So what did she say at the end of the personal interview? She reiterates not to discuss the proceedings with others. Well, not the judge, but the juror. Oh, what does the juror say? Yes. She does say ultimately she could be impartial. But again, this court and the Supreme Court has said in repeated multiple cases that that is not necessarily enough. I'm just kind of curious. What is enough? What is enough? Because I faced this when I was a trial judge, when I was a district judge. I did this at least on one occasion. I think it depends on what the juror said before. Bring all the jurors. I decided I had to interview each juror, and I had to talk to them, and I had to make an assessment of whether I thought the juror's response was honest and fair and whether I thought the juror could be fair. That's what I have a hard time trying to figure out here. The judge did exactly what we would want the judge to do, and she interviewed each juror individually, listened to what they had to say, observed them and their responses, and then came to a conclusion that she thought she accepted their answer. Unless it's a rebuttable presumption. It is a rebuttable presumption, but it is a heavy presumption. And in Remmer, the first-line remedy is a hearing, which did occur here. However, Remmer went back to the Supreme Court when the district court found that there was no cause for a mistrial, and in Remmer 3, the Supreme Court reversed the failure to grant a mistrial because the presumption and so forth had not been properly weighed. I think it's a heavy presumption precisely because some of these questions are difficult to get at through questioning. And then there's also a very significant deference of the district court, correct? I mean, you're arguing for a heavy presumption, but there's also a great deal of deference of the district judge's decision since that judge is present with the jurors and has the ability to view their demeanor, their conduct, their statements, and make that decision. I think as far as there's the district court's discretion, that is lessened here by the failure to apply the presumption. I think properly exercising discretion requires exercising within the correct legal framework. But did the district judge say, I'm not applying the presumption? I mean, she went through the process that was prescribed by SEMTOG. She did what they said wasn't sufficient there. She did not, but this court in Hinkson and Hernandez Mesa, that is actually a 1326 case, have said it's a matter of correctly identifying it sufficient to permit meaningful appellate review. There is no sense. But how do we know? I mean, she didn't say one way or the other, but then she went through the time bringing in each jury individually. Why should we just conclude without anything in the record that she didn't presume there could be prejudice? I think there's nothing to indicate that she did. But there's nothing to indicate that she did. I think she treated it as the defendant's burden to prove prejudice on this record. She obviously was concerned, or she never would have held the individual, she never would have brought each one into chambers, or whatever she did it. She was concerned. She agreed that basically that other people had been coming in and out and had not triggered this reaction, and that it was a little disappointing on the part of the jury that they would have this reaction. However, again, the Remmer hearing is a first-line remedy. What came out in that hearing is what required the mistrial here, and the mistrial was asked for two times after the hearing. You're talking about the individual hearings? The individual hearings. Are you talking about what she did in the courtroom on the morning when it was brought to her attention? No, I think at that point it was probably. It was the afternoon, or was it the afternoon? It was after lunch where she had the 101. There was one juror she spoke to in the sidebar because there was a second note about it, and that was when the mistrial motion was first made. It was not made at the first note. But the second note was what revealed that we were walked to our cars to make sure we got, we made it, you know, to ensure we got to the parking lot okay. That level of fear, and that is when she decided to have the rest of the hearing. That was the second day? On the second day. Right? Yes. And that happened, I believe, just after lunch on the second day, day eight. It was at the end of day seven when this first arose. And I see I'm. . . Yeah, I'll give you some time for rebuttal. Okay, thank you. Yes, don't worry. Good morning. May it please the Court. Ashley Aul for the United States. There are really two foundational errors underlying defendant sufficiency challenges, and they're related. The first is that defendant simply contravenes the burden of, pardon me, the standard of review, which requires this Court to make all reasonable inferences in support of the jury's verdict before assessing the sufficiency of the evidence. And in many cases, including just now today and throughout the brief, defendant is re-arguing inferences that were argued to the jury, and the jury simply rejected inferences about what codes mean, what defendant knew, how connected he was to his co-conspirators. As a matter of law. . . Absolutely, Your Honor. That's what I understood her argument to be. And there was a very strong evidentiary basis here. And in particular, and this gets to my second point, defendant also attempts to divorce himself from many things that his co-defendants said and did. And frankly, I'm dubious that even under the standard of review he can do that, but he certainly can't do it on the facts of this case. Defendant wasn't just a member of this conspiracy. He was the prime mover. If you go to ER 5575 to 77, this is one of the many times that de Leon and Santana discuss how defendant converted them to the beliefs that motivated all of their action. He brought them to al-Awlaki, who he'd been following for five years. He brought them to the idea that jihad was the one true path for them. He brought them to the idea that they had to go to Afghanistan and to fight. And so to say in this case, and they admitted repeatedly that he was their role model. He was their leader. And so defendant on the facts cannot divorce himself from all of the things that his co-defendants said and all of the plans. That's all we had. Would that be a crime? The agreement is the crime, Your Honor. Right, it's the agreement. This is all leading up to what I gather is the agreement. Correct. This is, frankly, this is evidence of the agreement. And some of the defendant's arguments, even today, are that the co-defendants said things and they had an agreement, but the defendant himself wasn't a part of it. And that simply is not borne out by the facts here. To go to some of the discussion today, on the discussion of AQ, for instance. Counts two and four. Correct, Your Honor. The entire argument about defendant not understanding that professors meant al-Qaeda is itself an inference contrary to the verdict. But even putting that aside, it's consistent with his behavior and comments both before and after that conversation. After that conversation, he reported to de Leon that he was making contacts through someone who had contacts to AQ in Yemen. That's at ER 5410. He later reported that he knew someone that had AQ contacts in Pakistan. That's at ER 5414. As you pointed out, he chanted or called out AQ, AQ at 5396 in a discussion of whose practices they would be following. And again, in that conversation, de Leon's response to him was, whatever you decide, you're the leader. I'm paraphrasing. So that evidence is consistent with an interpretation of professors as AQ. When did they reach this agreement with respect to al-Qaeda? Certainly by the time of Exhibit 621, which was the August 31st discussion with the professors. Certainly by then. And where is that? ER exhibit? Not so much. So you said before then, but in the record, where does one draw the conclusion or the inference that they already had an agreement to materially support al-Qaeda? This takes a little bit of historical discussion. So at the time that de Leon first recruited the confidential informant, he brought the confidential informant into a preexisting plan, and he told the confidential informant that there had already been he and Kabir had this plan to go to Afghanistan, and that Kabir had already given up his life to go. And so the question is, and that he was going to join him. He brought the CI into this. So were they going to go to help al-Qaeda? Were they going to go help the Taliban? I submit, Your Honor, that even by that point, the evidence certainly was constitutionally sufficient, which is a very low bar, to demonstrate that al-Qaeda was the goal. These were their idols. All of the material that Kabir in particular posted on his way to Afghanistan is extremely telling on this point. As he was leaving and making his way through Germany to Afghanistan, he posted repeatedly on Facebook, Exhibit 224 at ER, I think it's GER 440-44, is particularly compelling. This is the one that I have screen caps of in the brief. And it reflected a call to destroy America with pictures of Osama bin Laden and the Twin Towers falling interposed with pictures of what looks like children wearing a hat saying, Go to Hell, USA. He was listening to al-Awlaki, and he wasn't just listening to al-Awlaki. He was emailing him all the way back in 2009 saying, I agree with everything you have to say. And the record supports that what al-Awlaki had to say at that point is that it was every Muslim's obligation to fight, not to vote, but to fight. And he introduces co-conspirators to these views, and this was at the foundation of what they wanted to do from the outset. This was their prime belief system that motivated everything they did. Is that a crime? To the extent that they had an agreement to go to Afghanistan and do it, absolutely that is a crime. Believing those things, not a crime. Acting on those things by making an agreement to action, which the facts in this case show are very, very real, is absolutely a crime. In any case, it was well beyond the constitutional standard for sufficiency of the evidence. The jury was well within its power to credit that Kabir did have this intent, did have this agreement, and was acting on that agreement with his co-conspirators. With respect to the jury question. To go to Afghanistan to provide support to al-Qaeda on counts two and four. And to kill American officers. Correct, Your Honor. On the jury, I'll transition to the jury question. On the jury question, I do think that this case does not map well onto presumption cases, but I agree that the court need not make that decision. Footnote five in Sarkeesian found that on those facts that the presumption was rebutted. That's exactly the case here. Many of the presumption cases that the defendant has cited refer not to substantive errors, but procedural ones. And as has been discussed, there was nothing wrong with the court's procedures here. She did everything appropriate under the circumstances. She was extremely careful. She did her best to allay any concerns from the jurors. And in a moment, I believe she succeeded. And moreover, after all of that, the jurors either all indicated that they hadn't noticed anything, that they'd noticed it momentarily, or that after the voir dire and after the instructions, their concerns were allayed. And there is extreme deference to Judge Phillips' findings after she engaged in that colloquy. And her findings were that the only remaining concerns, if there were any, were about personal safety. And while I'm not downplaying the importance of personal safety, that is not what the presumption applies to. The presumption applies to concerns where jurors are being swayed somehow in the outcome of their deliberations, where they perceive some sort of threat. Well, given the nature of the case, if they express concern for their personal safety, doesn't that suggest that they may not be, you know... So they might, but I think that's the reason why the presumption doesn't apply. Certainly in a particular case, a judge could conduct voir dire and they could say, yes, I'm now terribly afraid of the FBI agents sitting behind the prosecution that are glaring at me, and I think I might be... there might be consequences if I acquit. That's what happened in Rutherford. That's not what happened here. But that's to say there need not be a presumption if it's just a possibility. In that case, the court can inquire and, as here, find out that there was no impact on their assessment of the evidence. No juror indicated a perceived threat that was tied to some outcome. There was obviously no bribe. There was no communication with them. It didn't provide them any information they couldn't have gotten otherwise. And so this is exactly the kind of case in which it was a defendant's burden to show some prejudice, and there was none shown. In any case, even if the presumption did apply, it was adequately rebutted based on the district court's conclusions. And in particular, at... So jurors 4 and 10 are the two jurors that even after the first discussion reported some remaining concerns. Juror number 4, at the end of the colloquy, she confirmed that she would have no problem sitting on the rest of the trial, she remained impartial, and that she had not been distracted that day. That is at ER 2052. And juror number 10 similarly affirmed that he or she could listen to the evidence, would not be distracted, that's at ER 2062, and when asked whether he or she would hold it against the parties, responded, absolutely not, affirming again that he or she could set it aside. That's at ER 2061 to 62. That was more than an adequate basis justifying the district court's findings to which this court should defer. If the court has no other questions, I'm willing to yield my time. Thank you. Okay. Thank you, Your Honors. In the government's presentation, I didn't hear a word about, again, the Count Five, the federal officers. Again, there may have been a plan to go to Afghanistan, there may have been a plan to provide material support for certain activities, but the evidence is constitutionally insufficient on the federal officers portion of that plan. Turning to the jury question quickly, the government makes some analogies to voir dire. This isn't voir dire. There are no peremptory strikes to get rid of jurors who may be on the border. The jurors have been sitting at this point for a week. The case is recognized that jurors do not want to admit that they are unable to be impartial, I think even more so when there's questions of racial or ethnic bias, and that for that reason, despite them being in good faith and the district court crediting them those, and we're not saying that she couldn't credit their assertions, that those are not enough to rebut what is a very heavy burden. Thank you, Your Honor. Okay. Thank you. Okay, we will... Thank you, Counsel. We appreciate your arguments this morning, the matters submitted.
judges: Kelly, Paez, Bade